**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SCOTT A. CASSON,

                                        Plaintiff,

        - v -                                                    Civ. No. 6:03-CV-421
                                                                        (DNH/RFT)

COMMISSIONER OF SOCIAL SECURITY, Michael J.
Astrue,[1]

                                        Defendant.

**APPEARANCES:**                                    **OF COUNSEL:**

OLINSKY, SHURTLIFF LAW FIRM              HOWARD OLINSKY, ESQ.
Attorney for Plaintiff
300 S. State Street, 5th Floor
Syracuse, NY 13202

HON. GLENN T. SUDDABY                         WILLIAM H. PEASE
United States Attorney for the Northern District of New York    Assistant United States Attorney
Attorney for Defendant
P.O. Box 7198
100 South Clinton Street
Syracuse, NY 13261

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

### REPORT-RECOMMENDATION and ORDER

        In this action, Plaintiff Scott A. Casson moves, pursuant to 42 U.S.C. § 405(g), for review of

a decision by the Commissioner of Social Security denying his application for disability insurance

benefits.[2]  Based upon the following discussion, this Court recommends that the Commissioner's

decision denying Social Security benefits be **affirmed**.

---

        [1] Michael J. Astrue became Commissioner of Social Security in February 2007.  Pursuant to Federal Rule of
Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.

        [2] This case has proceeded in accordance with General Order 18 which sets forth the procedures to be followed
when appealing a denial of Social Security benefits.  Both parties have filed briefs, though oral argument was not heard.
Dkt. Nos. 8 & 9.  The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. §
636(b) and N.D.N.Y.L.R. 72.3(d).

# I. BACKGROUND

## A. Facts

Scott Casson, born on December 27, 1962, was thirty-eight years old at the time the Administrative Law Judge's decision was rendered.  Dkt. No. 6, Admin. Transcript [hereinafter "Tr."] at p. 71.  Plaintiff received his General Education Development (GED) diploma and attended college for one and one-half years.  *Id.* at pp. 34 & 82.  Plaintiff's past work experience include being a loader-sorter for the United Parcel Service (UPS), supervisor for a paper company, maintenance worker for a trailer park, driver for a delivery company, and laborer for an excavation contractor.  *Id.* at pp. 17, 34-36, & 89.

On July 1, 2000, Plaintiff injured his left knee while attempting to mount a horse.  The saddle slipped sideways before Casson was fully mounted and the horse began to buck in circles with Plaintiff's left foot still in the stirrup until finally the saddle fell off.  *Id.* at p. 37.  Immediately following the accident, Casson went to St. Joseph's Hospital Emergency Room where x-rays of his knee were taken.  *Id.* at p. 122.  Thereafter, on July 3, 2000, after being referred from St. Joseph's Emergency Room, Plaintiff was examined by Stephen C. Robinson, M.D., at the University Orthopedic and Sports Medicine, P.C. ("University Orthopedic").  *Id.* at p. 120.  Dr. Robinson found that Plaintiff "had a tear of the lateral ligament complex of his [left][3] knee" and possibly had an anterior cruciate ligament (ACL) injury or distal meniscus pathology.  *Id.* at p. 121.  Dr. Robinson also indicated there was moderate effusion[4] of the left knee, Plaintiff lacked ten degrees of "full extension," he was

---

[3] Although the medical record reflects that the tear was in the right knee, it appears such was written in error as the rest of Dr. Robinson's notes, and other medical records, refer only to a left knee injury.

[4] Effusion is the "escape of fluid into a part or tissue[.]"  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 531 (28th ed. 1994).

"diffusely tender mostly over the posterior lateral aspect of the knee," there was moderate soft tissue swelling of the area and a "slight decreased sensation over the dorsum of his foot," but the knee had "full tibialis anterior and EHL motor function [and c]irculation was intact." *Id.* at pp. 120-21. There was also questionable anterior instability on Lachman's testing[5]. *Id*. at p. 120. An Magnetic Resonance Imaging (MRI) was recommended and thereafter administered on July 5, 2000. *Id.* at p. 121.

On July 11, 2000, Plaintiff was examined at University Orthopedic by Glenn B. Axelrod, M.D. *Id.* at pp. 122-23. Dr. Axelrod reviewed the results of the MRI as well as the x-rays from St. Joseph's Hospital and found there was an "acute injury to [Casson's] left knee with the ACL and entire lateral capsule and lateral ligaments." *Id.* at p. 122. He further stated there was an injury to Plaintiff's peroneal nerve. *Id.* Lachman's test was positive. For the pain, Dr. Axelrod was ready to prescribe Tylenol with Codeine, however, Plaintiff asked for Motrin so that he could drink beer. *Id.* at p. 123. Dr. Axelrod informed Plaintiff it was contraindicated to take Motrin. *Id.* Plaintiff then asked if Dr. Brett Greenky, a family physician, could treat him along with Dr. Axelrod. *Id.* Dr. Axelrod stated he would contact Dr. Greenky and then schedule Plaintiff for surgery. *Id.* Dr. Greenky met with Plaintiff on July 13, 2000, to discuss the surgery he would be performing with Dr. Axelrod. *Id.* at p. 124. He noted Plaintiff had a "fibular collateral ligament tear, posterior lateral corner tear, popliteus tender tear, ACL tear[,] and probably a lateral meniscus tear" as documented in the MRI. *Id.*

On July 17, 2000, Plaintiff underwent surgery to repair the damage to his left knee. In a post-operative examination, Dr. Greenky stated that the knee looked "fine" and the incision looked "good." *Id.* at p. 125. Plaintiff was put in a cylinder cast, prescribed Keflex, told to bear weight on the leg as could be tolerated with crutches, and told there would be a follow-up appointment in five weeks. *Id.*

---

[5] Lachman's Test is an "anterior drawer test for cases of severe knee injury." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1677 (28th ed. 1994).

at p. 125.  The cast was removed on September 7, 2000.  *Id*. at p. 127.  Dr. Greenky noted there was minimal tenderness and swelling, no lateral instability, and Casson could flex forty-five degrees with good stability.  *Id.*  Dr. Greenky told Plaintiff to continue an exercise program and attend physical therapy.  He also provided Casson with a leg brace and noted that Plaintiff remained disabled from work.  *Id.*

On September 11, 2000, at the request of the Commissioner, Plaintiff was consultatively examined by Berton Shayevitz, M.D.  *Id.* at pp. 112-15.  An x-ray of the left knee, completed that day by Pesho S. Kotval, M.D., revealed "[m]ild osteoarthritic changes around the left knee[.]"  *Id.* at p. 116. On examination, Dr. Shayevitz noted quad muscle strength of the right leg was 5/5 while the left was 2.5/5.  *Id*. at p. 114.  Sensation was diminished around the left knee and the medial left foot; there was also some atrophy in the left leg.  *Id*.  Dr. Shayevitz was unable to get any reflex in the left knee or ankle, though the right was normal.  *Id*.  Dr. Shayevitz opined that Plaintiff had "status post trauma to the left knee resulting in multi-directional instability with reconstructive surgery."  *Id.*  He indicated there was an "unrepaired left anterior cruciate ligament" and that Plaintiff was only recently out of the cast and becoming mobile.  *Id.*  Dr. Shayevitz's prognosis was for a very slow, gradual improvement with the necessity for at least one more surgery and a prolonged rehabilitative process.  *Id.*  Dr. Shayevitz concluded at that time that Plaintiff was quite limited in mobility, unable to bend, lift, climb, or carry, and had difficulty sitting for more that fifteen or twenty minutes before feeling leg cramps. *Id.*

On September 19, 2000, Naveed Siddiqi, M.D., State Agency Consultive Physician, completed a Residual Functional Capacity (RFC) Assessment.  *Id.* at pp. 129-36.  Dr. Siddiqi opined that Plaintiff could: 1) occasionally lift and/or carry fifty pounds; 2) frequently lift and/or carry twenty-five pounds;

3) stand, walk, and/or sit for six hours in an eight-hour work day; and 4) was unlimited in his ability to push and/or pull.  *Id.* at p. 130.  Dr. Siddiqi also indicated there were no postural, manipulative, visual, communicative, nor environmental limitations.  *Id.* at pp. 132-34.  In rendering this opinion, Dr. Siddiqi noted Plaintiff was currently "ambulating as tolerated with a leg brace," and was receiving Motrin for the pain as well as attending physical therapy.  *Id.* at p. 130.  In consideration of the medical evidence, including Plaintiff's 1996 surgery on his left ankle, Dr. Siddiqi opined that Plaintiff's knee impairment would not last a year and taking into account the pain and osteoarthritis, Plaintiff would be able to perform medium work by July 2001.  *Id.* at pp. 130-31.  On October 26, 2000, another State Agency Consultive Physician, B.W. Gajwani, M.D., reviewed Dr. Siddiqi's findings and affirmed the assessment.  *Id.* at p. 136.

On September 6, 2001, Dr. Greenky completed a medical evaluation of Plaintiff's physical impairments.  *Id.* at pp. 138-41.  Taking into account Plaintiff's ankle arthritis and left knee injury, Dr. Greenky noted Plaintiff's complaints of pain were credible, the impairment was expected to last at least twelve months, and the prognosis was guarded.  *Id.* at pp. 138-39.  He further opined that Plaintiff could: 1) sit continuously for six hours in an eight-hour workday; 2) stand continuously for one hour and stand for a total of two hours in an eight-hour workday; 3) walk continuously for one hour in an eight-hour workday; 4) lie down for eight hours; 5) occasionally lift and carry up to twenty pounds; 6) manipulate his hands and arms on a repetitive basis; and 7) use his right foot to push and pull leg controls on a repetitive basis, but not his left.  *Id.* at p. 140.  He also rated Plaintiff's knee strength at 4/5.  *Id.* at p. 138.

Plaintiff testified at the Hearing that two surgeries had been completed, with the second occurring in April 2001, and that a third surgery was possible.  *Id.* at pp. 30-31.  He also stated he had

a plate and five pins in his ankle from an injury occurring in 1994 and, as a result, developed arthritis in his ankle. *Id.* at p. 37. In terms of his daily living, Plaintiff stated he was able to bathe, shower, cook meals, do the dishes, laundry, and dust by himself. *Id.* at pp. 39-40. He also went fishing, watched his children, played on the computer, and read the newspaper. *Id.* Plaintiff then stated he could sit and stand for about two or two and one-half hours in a day or possibly stand for a longer period of time. *Id.* at p. 41. He also stated he could lift and carry about ten pounds and walk a half to one mile. *Id.* at pp. 41-42.

## B. Procedural History

On August 15, 2000, Casson filed an application for disability insurance benefits alleging a disability onset date of July 1, 2000. *Id.* at pp. 71-73. The application was denied initially and on reconsideration. *Id.* at pp. 44-49 & 52-54. On August 16, 2001, a Hearing was held before Administrative Law Judge (ALJ) John P. Chwalek, and on October 24, 2001, the ALJ issued an unfavorable decision against Casson. *Id.* at pp. 13-23 & 25-43. On March 13, 2003, the Appeals Council concluded that there was no basis under the Social Security Regulations to grant Plaintiff's request for review, thus rendering the ALJ's decision the final determination of the Commissioner. *Id.* at pp. 4-5. Exhausting all his options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal.

## II.  DISCUSSION

### A.  Standard of Review

Under 42 U.S.C. § 405(g), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied. *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d

Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g).  Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed.  *Johnson v. Bowen*, 817 F.2d at 986.

## B.  Determination of Disability

To be considered disabled within the meaning of the Social Security Act, a plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. *Id*. at § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis set forth in the Social Security Administration Regulations.  20 C.F.R. § 404.1520.  At Step One, the Commissioner "considers whether the claimant is currently engaged in gainful activity."  *Berry v.*

*Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends.  20 C.F.R. § 404.1520(b).  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations.  *Id.* at § 404.1520(d).  The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience.  *Berry v. Schweiker*, 675 F.2d at 467.  Where the claimant has such an impairment the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity.  *Id.*  If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity (RFC)[6] to perform his or her past relevant work despite the existence of severe impairments. 20 C.F.R. § 404.1520(e).  If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy.  *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. § 404.1520(f).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four).  *Berry v. Schweiker*, 675 F.2d at 467.  If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental

---

[6] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).

impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy. *Id.*; 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990). In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills. 20 C.F.R. § 404.1520(f); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

### C.  ALJ Chwalek's Findings

Casson was the only witness to testify at the Hearing. Tr. at 27-43. In addition to such testimony, the ALJ had Casson's medical records consisting of treatment reports and opinions from various treating and/or examining/consultive physicians, including, 1) University Orthopedic, Stephen C. Robinson, M.D.; 2) University Orthopedic, Glenn B. Axelrod, M.D.; 3) University Orthopedic, Brett B. Greenky, M.D., Treating Physician; 4) Berton Shayevitz, M.D., Orthopedic Consultative Examination; and 5) Naveed Siddiqi, M.D., and B.W. Gajwani, M.D., Non-Examining Agency Residual Functional Capacity Assessment. *Id.* at pp. 155-263.

The ALJ stated that Casson met the nondisability requirements and was insured for benefits through the date of the decision. *Id.* at p. 21. Using the five-step disability evaluation, ALJ Chwalek found that 1) Casson had not engaged in any substantial gainful activity since July 1, 2000, the alleged onset disability date; 2) he has a severe medically determinable impairment, namely, the knee injury due to pain, instability and post left knee trauma; 3) his severe impairment did not meet nor medically equal any of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4; 4) he has a residual functional capacity to perform the full range of sedentary work and therefore cannot perform any of his past work as a loader-sorter for UPS, supervisor for a paper company, maintenance

worker for a trailer park, driver for a delivery company, or laborer for an excavation contractor; but 5) Casson's RFC enables him to perform the normal duties of jobs that exist in significant numbers in the national economy. *Id.* at pp. 21-22.

### D. Casson's Contentions

Casson contends that the ALJ's decision denying benefits should be reversed because (1) Plaintiff, proceeding *pro se*, was prejudiced by his lack of counsel and the ALJ failed to fully develop the record; (2) at Step Two, the ALJ erred by finding that his bilateral ankle arthritis was not severe and did not consider the ankle impairment in combination with the knee impairment; (3) at Step Three, the ALJ erred by finding his impairments did not meet or equal an impairment in Listing 1.03 and he failed to seek the opinion of a medical expert as to whether Plaintiff's impairments met this Listing; (4) in assessing Casson's RFC, the ALJ incorrectly assessed Plaintiff's credibility and failed to properly follow the Treating Physician's Rule; and (5) at Step Five, the ALJ failed to consult a vocational expert in light of the fact that the sedentary work base was significantly eroded.  Dkt. No. 8, Pl.'s Brief.

### 1. *Pro Se* Status and Development of the Medical Record

A court reviewing a Secretary's decision "must be satisfied that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'" *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Gold v. Sec'y of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)).  Casson alleges that he appeared before the ALJ without representation and the ALJ erred by proceeding with the Hearing despite the ALJ's knowledge that Plaintiff sought counsel from Legal Aid.  Pl.'s Br. at pp. 9-12.  Social Security claimants are "entitled to be represented by counsel at the hearing and the ALJ must ensure that the claimant is aware of this right." *Robinson v. Sec'y of Health and Human Servs.*, 733 F.2d 255, 257 (2d Cir. 1984) (quoted in *Santana v. Apfel*, 44 F. Supp.

2d 482, 483 (E.D.N.Y. 1999)); *see also* 42 U.S.C. § 1383(d)(2)(B).  "Once a claimant has been

adequately notified of the right to proceed with a representative, a claimant may waive that right."

*Osorio v. Barnhart*, 2006 WL 1464193, at *8 (S.D.N.Y. May 30, 2006).

  In the case at hand, ALJ Chwalek clearly advised Plaintiff of his right to counsel at the Hearing

and noted that he was aware of Plaintiff's intent to obtain representation.  Tr. at pp. 27-29.  In reviewing

the Administrative Record, we note that said record is replete with documents also advising Plaintiff

of his right to representation.  *See* Tr. at pp. 55, 57-58, 59, 62-63, & 65.  At the Hearing, ALJ Chwalek

advised Plaintiff that if he had any reservations on whether or not he should have a representative at

the Hearing, then he should retain a representative.  *Id.* at p. 27.  Noting there was a possibility that

Legal Aid would assist Casson, ALJ Chwalek offered to postpone the Hearing until Legal Aid made

a determination on whether they would represent Plaintiff.  *Id.* at p. 28.  ALJ Chwalek further explained

that private attorneys could be obtained and Plaintiff could contact the local bar association.  *Id.*  ALJ

Chwalek then apprised Plaintiff of his option to waive his right to representation in which case the

Hearing would continue.  *Id.*  Plaintiff stated he had all the information an attorney would require and

affirmed that he waived his right to representation.  *Id.* at pp. 28-29.  Thus, from the record before the

Court, we are satisfied that the ALJ ensured that Plaintiff was aware of his right to be represented and

that Plaintiff waived that right.

  Despite Plaintiff's valid waiver of his right to representation, Plaintiff alleges he was prejudiced

when the ALJ did not fully develop the record by gathering evidence from his treating physician in

regards to ambiguities in the record concerning his second knee surgery.  Specifically, Plaintiff

contends that because of the lack of medical records during a twelve-month period following the

alleged onset disability date during which time Plaintiff's second knee surgery took place, the case

should be remanded for further development of the record.  Pl.'s Br. at pp. 9-11.  In support of this contention, Casson asks the Court to consider Dr. Greenky's pre-operative treatment notes, dated February 1, 2001.  *Id.*, Schedule A.

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty to develop the medical record if it is incomplete. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . .").  This affirmative duty is heightened in cases involving *pro se* claimants as the "ALJ has a duty to adequately protect a *pro se* claimant's rights 'by ensuring that all of the relevant facts [are] sufficiently developed and considered.'" *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (quoting *Hankerson v. Harris*, 636 F.2d at 895).  In this regard, the ALJ must make "every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (quoting 20 C.F.R. § 404.1512(d)); *see also Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 450-51 (S.D.N.Y. 2004). "Accordingly, an ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the *absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any gaps in the record before him." *Sanchez v. Barnhart*, 329 F. Supp. 2d at 450 (emphasis in original) (internal quotation marks and citations omitted).  In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability and additional information is needed to reach a determination.  20 C.F.R. at § 404.1512(e).

The issue of an incomplete record was first raised at the Hearing when Plaintiff noted that

information regarding his second surgery, which according to him occurred in April 2001, was missing from the Record.  Tr. at pp. 30-31.  Upon learning this information, the ALJ stated he would have Plaintiff sign a release form to send to Dr. Greenky in order to receive a report on the surgery.[7]  *Id.* at p. 31.  The ALJ asked if any other records were missing to which Plaintiff stated there were none.  *Id.* Subsequent to the Hearing, the ALJ received from Dr. Greenky a "Medical Evaluation: Physical Impairment" form, dated September 6, 2001.[8]  *Id.* at pp. 138-41.  In this evaluation, Dr. Greenky noted that he last treated Plaintiff on March 8, 2001, a date inconsistent with Plaintiff's allegation that surgery was performed in April 2001.[9]  *Id*. at p. 138.

In considering Casson's testimony regarding the date of the second surgery and in reviewing Dr. Greenky's medical evaluation, the ALJ determined that Dr. Greenky's stated dated of last treatment was in error.  *Id*. at p. 20.  Since the evaluation had been rendered on September 6, 2001, well after Plaintiff's second surgery (whether it occurred in February or April), the ALJ accepted the medical statement to be accurate as of September 6, 2001.  *Id*.  The ALJ gave great probative weight to Dr. Greenky's assessment and used the other medical evidence in the record to make his determination as to disability.  *Id*. at pp. 20-22.  Thus, there appears to be no prejudice to Plaintiff stemming from the ALJ's failure to procure the surgical procedure notes or progressive treatment notes as Dr. Greenky's opinion regarding Plaintiff's abilities post-surgery was not discounted by the ALJ as inconsistent with

---

[7] Although the transcript of the Hearing states the surgery was performed by Dr. Brabrinky, Plaintiff notes, on information and belief, that this was a phonetic recitation of the record and it was in fact Dr. Greenky who performed the surgery.  *See* Tr. at pp. 30-31; Pl.'s Br. at p. 6, n.2.

[8] It appears that prior to the commencement of the Hearing, Legal Aid contacted Dr. Greenky and asked him to fill out a medical assessment form for physical impairment as they were assisting Plaintiff in preparing his case.  Tr. at p. 137.

[9] Notably, this date is also inconsistent with Plaintiff's proposed evidence, Schedule A, which indicates a surgery occurring sometime in February 2001.  Pl.'s Br., Schedule A.

or unsupported by the medical record. *Id*. Since the ALJ was provided with pertinent information regarding Plaintiff's first surgery as well as a medical assessment after his second surgery, both adequate sources to determine disability, there was no need for the ALJ to re-contact the treating physician or any other medical source. 20 C.F.R. § 404.1512(e).

In addition to the February 2001 treatment notes, Plaintiff asks this Court to consider other medical records, including a MRI of his lumbar spine, dated January 16, 2002. Pl.'s Br. at p. 12, Schedules A & B.[10] It does not appear that such evidence was ever presented to the ALJ or the Appeals Council. In seeking consideration of the other medical records, Plaintiff asserts that these records indicate severe spinal abnormalities during the period when Plaintiff was still insured for Social Security Disability purposes and, in the event this Court recommends a remand, "it would be proper to inquire into the existence and severity of the spinal injuries in July 2000." Pl.'s Br. at p. 12.

The first record, dated October 31, 2001, consists of treatment notes stemming from a physical exam conducted by Sanjay Ramachandran, M.D., of the Parish Health Service Center. Pl.'s Br., Schedule B, Parish Health Service Center Form, dated Oct. 31, 2001. According to such notes, Casson complained of pain stemming from a back injury he received eight to ten years prior to the date of the visit. *Id*. The knee and ankle injuries are also mentioned in this record, however, as indicated by Dr. Ramachandran, Plaintiff controlled the pain with Motrin and a neurological exam revealed decreased sensation and strength in his left foot, but no focal deficits. *Id*. Examination of the lumbar spine revealed some mild lower lumbar tenderness, but good range of motion in his back. *Id*. Plaintiff further told Dr. Ramachandran that he did not want a referral to another orthopedic or back specialist and he did not want any further x-rays. *Id*. Dr. Ramachandran provided Plaintiff with a note stating he was

_____

[10] Since we've already disposed of Plaintiff's claim with regard to the February 2001 post-surgery treatment notes, we need not address Plaintiff's request to consider that evidence.

unable to work and required a disabled parking permit.  *Id.*  The second record, dated January 17, 2002,

is a review by Marcus A. Allen, M.D., of an MRI done on Plaintiff's lumbar spine.  *Id.*, Schedule B,

Lumbar Spine MRI, dated Jan. 17, 2002.   Dr. Allen's impression was that there was "lumbar

spondylosis . . . with mild asymmetric posterior disc/osteophyte complex to the right at L4-5" along

with other such findings.  *Id*.

42 U.S.C. § 405(g) provides in pertinent part that "[t]he court . . . may at any time order

additional evidence to be taken before the Commissioner of Social Security, but only upon a showing

that there is *new* evidence which is *material* and that there is *good cause* for the failure to incorporate

such evidence into the record in a prior proceeding . . . ."  (emphasis added); *see also Lisa v. Sec'y of

Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991); *Tirado v. Bowen*, 842 F.2d 595, 597

(2d Cir. 1998).  In accordance with this provision, the Second Circuit requires the Plaintiff to show that

the proffered evidence is "(1) new and not merely cumulative of what is already in the record . . . (2)

material, that is, both relevant to the claimant's condition during the time period for which benefits

were denied and probative . . . [and] (3) good cause [exists] for [claimant's] failure to present the

evidence earlier."  *Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d at 43 (internal

quotation marks and citations omitted).

Both of the medical records presented by Plaintiff were clearly available prior to the Appeals

Council's decision in March 2003, yet Plaintiff provides no explanation why these records were not

at least presented to the Appeals Council for consideration.[11]  This failure to present such evidence to

the Appeals Council is particularly perplexing in light of the fact that Plaintiff was represented by

---

[11] According to the Regulations, new and material evidence may be presented to the Appeals Council who "shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b).

counsel when he sought review of the ALJ's unfavorable decision.  In fact, Plaintiff was represented by the very same counsel who has sought review on his behalf of the same records in this Court.

Furthermore, Plaintiff fails to establish the materiality of such medical records.  "The concept of materiality requires . . . a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently."  *Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d at 43 (citations omitted).   These "new" medical records are not material as they are not probative.  The first medical record simply reiterates previous findings rendered by Plaintiff's treating physician as well as other medical sources already available to the ALJ when the determination of disability was made.  There was no new treatment plan prescribed and there appears to be no exacerbation of his injuries.  Thus, this evidence seems to be cumulative of what is currently in the record and there is no reasonable possibility that this new evidence would have influenced the Commissioner to decide Plaintiff's application differently.

Similarly, the second medical record only pertains to a back injury and does not make mention of the knee injury, the impairment for which Plaintiff's claimed disability was based.  *See* Tr. at pp. 75-84.  Furthermore, this back injury occurred nearly eight to ten years prior to the January 2002 examination and during this time span, Plaintiff worked as a supervisor in a paper company, driver for a delivery company, and laborer for an excavation contractor.  *Id.* at p. 77.  His back problems did not seem to affect his ability to work and even if considered in conjunction with the knee injury, there is no reasonable possibility that this new evidence would have influenced the Commissioner to decide Plaintiff's application differently.

Accordingly, Plaintiff was not prejudiced by the lack of representation nor by the ALJ's failure to develop the record, and a remand to consider the "new evidence" would be inappropriate.

## 2.  Step Two - Severity of the Ankle

Plaintiff alleges the ALJ erred by failing to find Plaintiff's ankle arthritis a severe impairment and failed to consider the ankle impairment in conjunction with the knee impairment.  Pl.'s Br. at pp. 13-14.

At Step Two, the ALJ must determine whether an individual has an impairment or combination of impairments that are severe.  20 C.F.R. § 404.1520.  The Second Circuit has warned that the Step Two analysis may not do more than "screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (quoted in *de Roman v. Barnhart*, 2003 WL 21511160, at *11 (S.D.N.Y. July 2, 2003)).  An impairment is <u>not severe</u> at Step Two if it does not significantly limit a claimant's ability to do basic work activities.  20 C.F.R. § 404.1521(a).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); *see also* Social Security Ruling 85-28, 1985 WL 56856, at *3-4, *Titles II and XVI: Medical Impairments That Are Not Severe* (S.S.A. 1985).

If a claimant has multiple impairments, the combined effect of all impairments should be considered "without regard as to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523; 42 U.S.C. § 423(d)(2)(B); *see also Schulte v. Apfel*, 2000 WL 362025 (W.D.N.Y. Mar. 31, 2000).  "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  *Rosario v. Apfel*, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999)

(quoting Social Security Ruling 85-28, 1985 WL 56856, at *3, *Titles II and XVI: Medical Impairments That Are Not Severe* (S.S.A. 1985)).

In this case, though Plaintiff did not initially claim that his ankle injury contributed in any way to his alleged disability, the ALJ considered and addressed the severity of the condition and ultimately determined that it did not constitute a severe impairment as it did not significantly limit Casson's ability to do basic work activities.  Tr. at p. 18.  Such determination is supported by substantial evidence in the record.  The ALJ noted that Plaintiff underwent surgery on his left ankle in 1996 "with minimal difficulties thereafter. . . . [and that Plaintiff] was well when he was injured on July 1, 2000."  *Id*. at p. 18.  Nowhere in Plaintiff's Disability Report does he list his ankle injury as an impairment which prevents him from working.  *See* Tr. at pp. 75-84, Disability Report Adult, dated July 31, 2000.  Nor does he list any physician who treated his ankle impairment.  *Id*.  By Plaintiff's own account, after his ankle injury and prior to the knee injury, he worked as a driver for a delivery company and laborer for an excavation contractor.  *Id*.  An examination conducted by Dr. Shayevitz on May 14, 1999, revealed that Casson had normal ankle range of motion and Dr. Siddiqi opined upon reviewing the record that Plaintiff had minimal difficulties with his ankle since 1996.  *Id*. at pp. 114 & 130.

In light of the above, we determine that in assessing Plaintiff's ankle injury to not be severe, the ALJ applied the correct legal standard and such determination is supported by substantial evidence.

### 3.  Step Three - Listing under § 1.03 and Medical Expert

In Step Three of the sequential disability evaluation process, the ALJ determines whether the claimant's conditions meet or equal the requirements for any impairment listed in Part 404 of the Social Security Regulations, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  "The Listing of Impairments describes, for each of the major body systems, impairments which are considered severe

enough to prevent a person from doing any gainful activity."[12]  *Id.* at § 404.1525(a).  If a claimant's impairment or combination of impairments meets or equals a listed impairment, the evaluation process is concluded and the claimant is considered disabled without considering the claimant's age, education, or work experience.  *Id.* at § 404.1520(a)(4)(iii).

The burden is on the plaintiff to present medical findings which show that his or her impairments match a listing or are equal in severity to a listed impairment.  *Zwick v. Apfel*, 1998 WL 426800, at *6 (S.D.N.Y. July 27, 1998).  In order to show that an impairment matches a listing, the claimant must show that his or her impairment meets all of the specified medical criteria.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); 20 C.F.R. § 404.1525(d).  If a claimant's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify.  *Sullivan v. Zebley*, 493 U.S. at 530.  To make this showing, the claimant must present medical findings equal in severity to all requirements which are supported by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. § 404.1526(b).  Such abnormal physical findings "must be shown to persist on repeated examinations despite therapy."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B).  Furthermore, the medical reports should reflect physical limitations based upon actual observations and not just the claimant's subjective complaints.  *Id.*

Plaintiff alleges the ALJ erred in determining that his impairments are not of the severity which meet or equals Listing § 1.03.  Pl.'s Br. at pp. 14-17.  There appears to be some discrepancy between Plaintiff and Defendant as to what Regulation was in effect at the time the ALJ rendered his decision on October 24, 2001.  The Commissioner argues that Casson cites to a version of Listing § 1.03 that

---

[12] The major body systems include the musculoskeletal system, special senses and speech, respiratory system, cardiovascular system, digestive system, genito-urinary system, hemic and lymphatic system, skin, endocrine system, multiple body systems, neurological, mental disorders, malignant neoplastic diseases, and most recently added, the immune system.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

has an effective date of February 19, 2002. *Id.* at p. 14, n.3; 66 Fed. Reg. 58010-01 (Nov. 19, 2001).[13]

While the Court agrees that according to the Federal Register, an amendment to Listing § 1.03 was

enacted, the Court's independent research of historical versions of the C.F.R. reveal that as early as

1999, such amendments appear in the Listing.  Despite this confusion, the Court finds that substantial

evidence supports the Commissioner's decision that Plaintiff's knee impairment did not meet nor

medically equal either version of Listing § 1.03.

> The Government contends the proper version of § 1.03 to be applied is as follows:
>
> 1.03 Arthritis of a major weight-bearing joint (due to any cause):  With history of persistent joint pain and stiffness with signs of marked limitation of motion or abnormal motion of the affected joint on current physical examination. With:
>
> A. Gross anatomical deformity of hip or knee (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk and stand; or
>
> B. Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint and return to full weight-bearing status did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03.

> Casson, on the other hand, contends that the proper version of the Listing is as follows:

"Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to

ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not

expected to occur, within 12 months of onset."  Pl.'s Br. at p. 15.  The major difference between these

---

[13] In accordance with the "Explanation of Effective Date" for that Regulation, the rules already in place would govern all claims until the effective date, February 19, 2002.  Once the new Regulations become effective, such Regulations would apply to new applications filed on or after the effective date.  However, "[w]ith respect to claims in which [the Commissioner has] made a final decision, and that are pending judicial review in Federal court, . . .  the court's review of the Commissioner's final decision [sh]ould be made in accordance with the rules in effect at the time of the final decision."  66 Fed. Reg. 58010-01 (Nov. 19, 2001).  Since the Commissioner's final decision was made on October 24, 2001, prior to the effective date for the new Regulations, February 19, 2002, presumably the rules in effect at the time the ALJ rendered his opinion would be relevant for our review.

two versions is that the amendments separated § 1.03(B) from the arthritis Listing, making a separate

Listing for Reconstructive Surgery of a Major Weight-Bearing Joint, and substituted the requirement

that "full weight-bearing status" occur with the "inability to ambulate effectively."  As explained in the

Federal Register, the purpose of the amendment is to account for the fact that "with advances in surgical

techniques and post-surgical treatment, some individuals who are not able to bear full weight on a lower

extremity nevertheless have sufficient ability to ambulate to be able to work." "  66 Fed. Reg. 58010-

01 (Nov. 19, 2001).  Substantial evidence exists showing Plaintiff could bear full weight and ambulate

effectively.

Although Plaintiff had a knee injury which required surgery, he was neither markedly limited

in his ability to stand or walk nor did he fail to return to normal weight-bearing status.  According to

Dr. Greenky's September 2001 assessment, Plaintiffs diagnosis was "bilateral ankle arthritis, complex

left knee instability, status post reconstruction with partial peroneal nerve palsy, left leg."  Tr. at pp.

18 & 138-41.  Dr. Greenky stated Plaintiff had chronic pain in his left knee and right ankle, a brace had

to be worn on the knee, he was "undergoing low impact strengthening of the left leg and was taking

Motrin for pain relief."  *Id.*  Dr. Greenky then noted Plaintiff's impairment lasted or could be expected

to last twelve months and the prognosis was guarded.  *Id.* at p. 139.  Nevertheless, Dr. Greenky opined

that Casson could sit for a total of six hours in an eight-hour workday, stand for a total of two hours in

an eight-hour workday, and walk for a total of one hour in an eight-hour workday.  *Id.* at p. 140.  Dr.

Greenky further noted that Plaintiff had a range of motion of five to one hundred degrees of the left

knee and his left knee strength was 4/5.  *Id.* at p. 138.

Drs. Siddiqi and Gajwani found, taking into account Plaintiff's mild osteoarthritis and pain, that

Casson's impairment would not last more than a year past the date of injury.  *Id.* at pp. 130-36.  They

further noted that in a year's time, Plaintiff would be back to normal gait and station.  *Id.*   Also, at the

Hearing, Plaintiff testified he was able to bathe, shower, cook meals, do the dishes, laundry, and dust

by himself.  *Id.* at pp. 39-40.  He also fishes off a dock at least once a week.  *Id.* at p. 40.  Plaintiff

further stated he could sit and stand for about two or two and one-half hours in a day or possibly stand

for a longer period of time and that he could also lift and carry about ten pounds and walk a half to one

mile.  *Id.* at pp. 41-42.  Plaintiff's own testimony rebuts his contention that he could not ambulate

effectively as that term is defined in the Regulations.  Casson's proffered version of § 1.03 explains in

relevant part, that

> [t]o ambulate effectively, individuals must be capable of sustaining a reasonable
> walking pace over a sufficient distance to be able to carry out activities of daily living.
> . . . [E]xamples of ineffective ambulation include, but are not limited to, the inability to
> walk without the use of a walker, two crutches or two canes, the inability to walk a
> block at a reasonable pace on rough or uneven surfaces, . . . the inability to carry out
> routine ambulatory activities, such as shopping and banking . . . ."

Considering Plaintiff's testimony along with the opinions of the various physicians discussed above,

we find that substantial evidence supports the Commissioner's finding that Plaintiff's knee impairment

does not meet nor medically equal any of the listed impairments.

In addition to this claim, however, Plaintiff further alleges that the ALJ erred when he failed,

pursuant to 20 C.F.R. § 404.1526, to seek the opinion of a medical expert in determining whether

Plaintiff's impairments were of a severity to meet or equal Listing § 1.03.  Pl.'s Br. at pp. 17-19.

Pursuant to the Regulations, if a claimant has a medically determinable impairment that does

not meet the requirements of a specific Listing, the Agency must consider medical equivalence.  20

C.F.R. § 404.1526; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(H)(4).  In determining whether a

claimant's impairment is medically equivalent to a Listed Impairment, the Agency considers whether

the medical findings are "at least equal in severity and duration to the criteria of any listed impairment."

20 C.F.R. § 404.1526(a); *see also Brown v. Apfel*, 174 F.3d 59, 64 (2d Cir. 1999) (citing, *inter alia*, *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)).   The medical equivalence determination includes consideration of medical evidence, such as a claimant's symptoms, signs, and laboratory findings; the Agency does not consider, at this stage, vocational factors such as age, education, or past work experience.   S.S.R. 96-6p, 1996 WL 374180, at *3, *Policy Interpretation Ruling Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence* (S.S.A. 1996).

As Plaintiff readily concedes, Social Security Ruling 96-6p provides that the "signature of a State agency medical . . . consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."   *Id*.   And, when an ALJ determines that an impairment is not "equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied" by the above-mentioned document.   *Id*.

Casson contends that although the Record contains the SSA-831-U5 Forms, such Forms were completed two and three months after the alleged onset date, whereas Dr. Greenky's assessment was provided twelve months after the alleged onset date, thus, the ALJ should have obtained an updated expert opinion as to medical equivalence.   Social Security Ruling 96-6p cites two additional circumstances upon which an updated medical opinion is required:

> When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

S.S.R. 96-6p, 1996 WL 374180, at *3-4.

An updated medical opinion is <u>only</u> required when the new medical evidence submitted would, *in the ALJ's opinion*, "change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id.* at *4. The decision to obtain an updated medical opinion in such circumstances is wholly within the ALJ's discretion. Here, though Dr. Greenky's functional assessment was provided after the State Agency Consultants submitted their assessment, the new information does not specify any new limitations on Casson's ability to do work-related activities; in fact, all three opinions consistently state that Plaintiff retained the ability to perform at least sedentary work. Therefore, it is reasonable that the additional information would not have changed the Agency Consultants' findings, and therefore, the ALJ's decision not to obtain an updated opinion was not in error.

### 4. Residual Functional Capacity

In determining Casson's RFC and his ability to perform work, the ALJ found Plaintiff could perform sedentary work[14] in that

> the claimant remains able to lift and/or carry 20 pounds occasionally, no amount frequently, stand for 1 hour, walk for 1 hour and sit for 6 hours in an 8-hour workday, use his hands and arms on a repetitive basis and use his right, but not his left foot to push and pull leg controls on a repetitive basis.

Tr. at p. 20.

---

[14] The Social Security Regulations define sedentary work as follows:
Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
20 C.F.R. § 404.1567(a).

In making this assessment, the ALJ considered Plaintiff's allegations regarding the disabling effects of his symptoms to be "sufficiently credible[.]" *Id*. at p. 19.  The ALJ also gave "great probative weight" to Dr. Greenky, Casson's treating physician.  *Id*. at p. 20.  Casson argues that the ALJ improperly assessed his credibility in terms of the disabling effects of his symptoms and the ALJ failed to apply the Treating Physician Rule.

### a.  Plaintiff's Credibility

Under 20 C.F.R. § 404.1529(a), subjective pain will be considered in determining a claim for disability to the extent in which "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  Symptoms such as pain are to be considered by the ALJ at all steps of the disability determination.  20 C.F.R. §§ 404.1529(a) & (d).  A claimant's statements about the persistence, intensity, and limiting effects of these symptoms are evaluated in the context of all objective medical evidence, which includes medical signs and laboratory findings.  *Id*. at § 404.2539(c)(4).  Once medically objective evidence is submitted, the ALJ must identify the severity of the pain and whether that pain will limit the claimant's ability to work.  *Id*. at § 404.1529(c).  "It is well settled that 'a claimant's subjective evidence of pain is entitled to great weight' where . . . it is supported by objective medical evidence." *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)).  However, in a case where subjective symptoms are identified, "the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the pain alleged." *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y 1987).  Where the ALJ resolves to reject subjective testimony with regards to pain and other symptoms, he or she "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are

legitimate reasons for the ALJ's disbelief and whether his [or her] determination is supported by substantial evidence." *Id.* at 608 (citing, *inter alia*, *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1045 (2d Cir. 1985)).  In evaluating a claimant's complaints of pain, an ALJ must consider several factors set forth in the Regulations including:

> (i)     [The claimant's] daily activities;
> (ii)    The location, duration, frequency, and intensity of [claimant's] pain or other symptoms;
> (iii)   Precipitating and aggravating factors;
> (iv)    The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms;
> (v)     Treatment, other than medication, [claimant] receive[s] or ha[s] received for relief of [his or her] pain or other symptoms;
> (vi)    Any measures [claimant] use[s] or ha[s] used to relieve [his or her] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii)   Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

In determining Plaintiff's credibility with regard to the effect of his symptoms, including pain, the ALJ considered the factors set forth in 20 C.F.R. § 404.1529, the medical record, including various medical opinions, as well as Plaintiff's own testimony.  *See* Tr. at p. 19.  The ALJ concluded that "[g]iven the claimant's activities, clinical findings, medical treatment and the assessment of the treating physician, the claimant's allegations of totally disabling symptoms are not credible, but are considered sufficiently credible to support a conclusion that the claimant is limited to sedentary work."  *Id.*  Such conclusion is supported by substantial evidence.

In a September 11, 2000 Report, Consultive Examiner Dr. Shayevitz found that Plaintiff was limited in his mobility, unable to bend, lift, climb, or carry, and had difficulty sitting over fifteen to twenty minutes without getting cramps; Casson's hearing, speech, and use of upper extremities were not found to be impaired.  *Id.* at pp. 19 & 114.  Then on September 19, 2000, Dr. Naveed Siddiqi, a

State Agency Consultive Physician, prepared a Physical Residual Functional Capacity Assessment, which was reviewed and affirmed by Dr. B.W. Gajwani, another State Agency Physician, on October 26, 2000. *Id.* at pp. 19 & 129-36. Dr. Siddiqi opined Plaintiff could occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty-five pounds, sit, stand, and/or walk for six hours in an eight-hour workday, had an unlimited ability to push and/or pull with his feet and hands, and had no postural, manipulative, visual, communicative, or environmental limitations. *Id.* Dr. Siddiqi further noted that although Plaintiff was limited at the time, taking his pain and osteoarthritis into account, the impairment was not expected to last more than a year and by July 1, 2001, he would be able to perform medium work. *Id.* Thereafter, in September 2001, Plaintiff's treating physician, Dr. Greenky, found Plaintiff could lift and/or carry twenty pounds occasionally but none frequently, stand and walk for one hour, sit for six hours in an eight-hour workday, use his hands and arms on a repetitive basis, and could push and pull leg controls on a repetitive basis with his right foot, but not the left. *Id.* at pp. 19 & 138-41. At the Hearing, Plaintiff testified he underwent two surgeries and that a third was possible, he had lower back pain and swelling of his left knee, and took Motrin for his pain. *Id.* at pp. 19 & 36-39. Plaintiff further described how he was able to bathe, shower, cook meals, do the dishes, laundry, and dust by himself and that he went fishing, watched his children, played on the computer and read the newspaper. *Id.* at pp. 39-40. Plaintiff also testified that he could carry ten pounds, sit and stand for two to two and one-half hours, and walk half a mile, though he would have to use an ice pack on his knee afterwards. *Id.* at p. 19 & 39-42.

Taking into account the medical opinions, including his treating physician, the ALJ has sufficiently referred to substantial evidence that demonstrates that although pain may exist and Plaintiff could not perform his past work, the effect of the symptoms of his impairment was not so severe as to

be disabling.  The objective medical evidence showed that Plaintiff could do work of a sedentary nature.  Thus, the ALJ correctly determined that Casson's testimony regarding his assertions of totally disabling symptoms was not fully credible.

### b.  Treating Physician's Rule

Plaintiff further asserts that the ALJ did not apply the proper legal standards in assigning weight to the opinion of his treating physician, Dr. Greenky, when the ALJ stated he gave "great probative weight" to the assessment made by Dr. Greenky.  Pl.'s Br. at pp. 21-23.  Plaintiff alleges that had the ALJ afforded Dr. Greenky's assessment controlling weight, he could not have found Plaintiff was capable of a full range of sedentary work.  *Id.* at p. 21.

The Regulations require an ALJ to give "controlling weight" to the opinion of a treating physician on the issue of the nature and severity of a claimant's impairment if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Lunan v. Barnhart*, 2003 U.S. Dist. Lexis, at *11 (N.D.N.Y. Dec. 4, 2003).  If the treating physician's opinion is not given controlling weight, the weight to be afforded to the opinion is to be based on several factors, which include: (1) the length, nature and extent of the treatment relationship, including the frequency of examination; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the medical opinion with the medical record as a whole; (4) whether the treating physician is a specialist; and (5) any other relevant factors that tend to support or contradict the treating physician's opinion.  20 C.F.R. § 404.1527(d)(2) (cited in *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998)).

Despite Plaintiff's assertions, the ALJ's conclusions on whether Plaintiff could perform a full

range of sedentary work was, in essence, fully based upon the assessment made by his treating physician, Dr. Greenky.  As noted previously, Dr. Greenky opined Plaintiff could lift and/or carry twenty pounds occasionally but none frequently, stand and walk for one hour but sit for six hours in an eight-hour workday, use his hands and arms on a repetitive basis as well as push and pull leg controls on a repetitive basis with his right foot, but not the left.  Tr. at pp. 138-41.  This is the exact determination utilized by the ALJ.  *Id.* at p. 20.  The fact that the ALJ stated he was giving Dr. Greenky's assessment "great probative weight" instead of using the magic words "controlling weight" makes no difference in this case.  As such, we find that the ALJ accorded proper weight to Dr. Greenky's medical opinion.

### 5.  Step Five - Vocational Expert

Plaintiff asseverates that the case should be remanded for vocational expert testimony because the ALJ erred when at Step Five he did not consult a vocational expert where the sedentary work base is significantly eroded.  Pl.'s Br. at pp. 23-24.

If at Step Four the ALJ finds that the claimant cannot perform his past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy.  *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. §§ 404.1520(f) & 416.920(f).  "Generally speaking, if a claimant suffers only from exertional impairments, *e.g.*, strength limitations, then the Commissioner may satisfy her burden by resorting to the applicable grids[]" set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a).  *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)); *see also Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Brown v. Comm'r of Social Security*, 2005 WL 1745655, at *3 (N.D.N.Y. June 30, 2005) (citations omitted); 20 C.F.R. § 404.1569a.  "For a claimant whose characteristics match the criteria of a

particular grid rule, the rule directs a conclusion as to whether he is disabled." *Rosa v. Callahan*, 168 F.3d at 82 (quoting *Pratts v. Chater*, 94 F.3d at 38-39); *see also Bapp v. Bowen*, 802 F.2d at 604; *Brown v. Comm'r of Social Security*, 2005 WL 1745655, at *3.

Nevertheless, if both exertional and nonexertional limitations exist, then the "guidelines cannot provide the exclusive framework for making a disability determination." *Bapp v. Bowen*, 802 F.2d at 605. Consequently, "where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment, the application of the grids is inappropriate." *Id.* at 605-06; *Rosa v. Callahan*, 168 F.3d at 82 (quoting *Bapp* for the proposition that if significant nonexertional impairments exist at Step Five, then "application of the grids is inappropriate"). If these conditions exist, then the Commissioner "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp v. Bowen*, 802 F.2d at 603; *Rosa v. Callahan*, 168 F.3d at 82 (quoting *Bapp*); *Brown v. Comm'r of Social Security*, 2005 WL 1745655, at *3.

Here, the ALJ found that based on Plaintiff's RFC, he could not perform any of his past relevant work. Tr. at p. 20. Therefore, the burden shifted to the Commissioner to show that Plaintiff has the RFC to perform other jobs that exist in significant numbers in the national economy. *Id.* Taking into account Plaintiff's age, education, and vocationally relevant past work experience in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, the ALJ found that the guidelines were applicable because there were no nonexertional limitations. *Id.* at pp. 20-21. The Guidelines may be used only if Plaintiff has the exertional residual functional capacity to perform substantially all of the seven primary strength demands required at the given level of exertion. *Id.* at p. 21.

In determining the physical exertion requirements of work in the national economy, the jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567.  Sedentary work involves:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Id.* at § 404.1567(a); *see also* Social Security Regulation ("SSR") 96-9p, 1996 WL 374185, *Policy Interpretation Ruling Titles II and XVI: Determining Capability to do other Work–Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work* (S.S.A. 1996) (stating that "'[o]ccasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of an 8-hour workday.  Unskilled sedentary work also involves other activities, classified as 'nonexertional,' such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.").

In this case, the ALJ noted that Plaintiff is a younger individual, since he was thirty-eight at the time of the Hearing, had more than a high school education, and no transferable skills from any past relevant work.  Tr. at p. 21.  After determining only exertional limitations were present, the ALJ utilized the Medical-Vocational Guidelines and determined that Plaintiff was not disabled.  *Id.*

Plaintiff states that because Dr. Shayevitz found Plaintiff could not bend, *i.e.* stoop, which is a nonexertional postural limitation, the use of the Guidelines was improper.  *See id.* at p. 114.  However, substantial evidence exists supporting the ALJ's contention that only exertional limitations existed.  Drs. Siddiqui and Gajwani opined that Plaintiff had no postural limitations.  *Id.* at p. 132.  Moreover, Dr. Greenky did not note any limitations other then exertional limitations.  *Id.* at pp. 140-41.

"Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (citing, *inter alia*, *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988)).

Therefore, the ALJ correctly applied the legal standards when the ruling was based on these guidelines without further inquiry of a vocational expert. *See Thompson v. Barnhart*, 75 Fed. Appx. 842, 844 (2d Cir. 2003) (unpublished opinion) (finding that "[b]ecause the ALJ expressly found that [the claimant] had the residual functional capacity to perform essentially the full range of sedentary work, a conclusion supported by substantial evidence, the law permitted the Commissioner to meet her burden 'by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)'") (citing *Rosa v. Callahan*, 168 F.3d at 78).

### III. CONCLUSION

In light of the foregoing discussion, the Court finds the ALJ applied the proper legal standards and substantial evidence exists substantiating his finding of no disability.

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of*

*Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV.

P. 72, 6(a), & 6(e).

Date:    August 22, 2007
         Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge